## THE EMILY B. MAXWELL.

### MULLIN v. CHAMBERLAIN.

(Circuit Court of Appeals, Sixth Circuit. October 3, 1899.)

### No. 652.

COLLISION—SAILING VESSELS MEETING—CHANGE OF COURSE.

Under the sailing rules governing the navigation of the lakes (28 Stat. 645, rules 16, 20), which require a vessel running free to keep out of the way of a vessel closehauled, and the latter to keep her course and speed, the luffing half a point by a vessel closehauled on approaching one running free, and the subsequent falling off half a point, do not constitute a change of course, within the rules, so as to render her in fault for a collision.

Appeal from the District Court of the United States for the Eastern District of Michigan.

C. E. Kremer, for appellant.

F. H. Canfield, for appellee.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

TAFT, Circuit Judge. This is an appeal from the decree of the district court of the United States for the Eastern district of Michigan in favor of the libelant in a collision case. The collision occurred between the schooner Col. Ellsworth and the schooner Emily B. Maxwell, about 4 o'clock in the morning of September 2, 1896, in the Straits of Mackinaw, about 4 or 5 miles to the eastward of Waugoshance light. It resulted in the sinking and total loss of the Ellsworth. The Ellsworth was a three-master fore and aft canal schooner, of 306 tons register, and was proceeding light, without cargo, from Charlevoix, Mich., to Blind River, Ontario. She was carrying a mizzen, mainsail, foresail, staysail, and jib. She was sailing closehauled on the wind, and was headed on a course of E. ½ S. The night was rainy and dark, and the wind blowing strongly about 20 miles an hour, say S. S. E. She was making about 3 or 4 miles an hour. Under these conditions it appears that she would make about a point and a half leeway per mile. The Maxwell was a schooner of 340 tons, loaded with a cargo of stone from Alabaster, Mich., to South Chicago. She had the wind free on her port side, and was sailing about 7 miles an hour, and making but little leeway. Both schooners were carrying the proper signal lights. About 4 o'clock the lookout on the Ellsworth reported the red light of a vessel, which afterwards proved to be the Maxwell, ahead, but a little on the port bow. The captain came forward, looked at the light through the glass, and directed the man at the wheel "to keep her close up, or close at it," and directed the lookout to exhibit a torch to the approaching vessel. The torch was lighted, and the helmsman luffed slightly, not to exceed a half a point. After the torch was burned out, the captain, through his glass, saw the green light of the Maxwell, a little on the starboard bow, and remarked to his helmsman, "He is all right, he is going to the windward of us," and directed him "to keep a good full on her," so that she should be better under control. Accordingly the wheelsman let the vessel go off a little, not to exceed half a point. In a short time both the Maxwell's lights were seen off the Ellsworth's starboard bow. When the Ellsworth was within two or three lengths of the Maxwell, and the master of the Ellsworth concluded that the collision was inevitable, he ordered the wheel to be put hard up, and let go her mizzen sheet. The vessel had but little time to swing, and before she had done so materially the collision occurred, and the Ellsworth sank. This is the case as the court below must have found it to be to sustain the decree. There is a variation in the allegation of the libel from the case as made from the evidence by the libelant, in that the libel alleges that after the red light was first seen and reported, and the torch was burned, the Maxwell showed

both her lights, and then shut out the red light and showed only the green light. The evidence does not show that between the exhibiting of the red light and the exhibiting of the green light both lights on the Maxwell were observed by those on the Ellsworth. If it is true that first the red light was seen, and then the green light, it would seem to follow that at some time it would have been possible for both lights to be seen on board the Ellsworth, so that the discrepancy between the evidence and the allegations would have no importance in fixing the positions and courses of the approaching vessels.

The case of the Maxwell, in the answer of her owner and by the evidence, is that while on the course of W. by S., with the wind fresh from about S., a red light was seen a little on the Maxwell's port bow, that the Maxwell's course was then slightly changed under a port helm, and that thereafter the Ellsworth suddenly changed her course and showed both lights, when the order of "Hard up the helm," was given, and the Maxwell's mizzen sheet was let go, and the Maxwell, already swinging rapidly, fell off to the northward, until she was heading N. W., and still swinging, when the Ellsworth, which had put her helm up, struck the Maxwell, stem on, on her port bow, near the cat head, breaking in her own bows so that she soon after went to the bottom. The Maxwell, after rescuing the crew of the Ellsworth, sailed back to Mackinaw.

There is a dispute as to the direction of the wind. The evidence on board the Ellsworth is that she was sailing closehauled, and that the wind was S. S. E. The evidence for the Maxwell is that the wind was due S., or a little W. of S., that she was sailing closehauled, and that her sails were trimmed flat aft. The helmsman of the Ellsworth was subsequently hired for a voyage upon the Maxwell, and was called by the owner of the Maxwell. He testifies that he was steering by the compass, and not by the wind, but he also testifies that the vessel was closehauled. The learned district judge who heard the witnesses necessarily found that the Ellsworth was sailing closehauled on the wind, and we agree with him. We think the evidence that the vessel was closehauled to be more worthy of credence than evidence as to the general direction of the wind. As the Ellsworth was closehauled, and the Maxwell was running free, the relative duties of the two vessels in passing each other are clearly established by the rules governing the navigation of the lakes. Rule 16 of the act of 1895 (28 Stat. 645–648) provides that:

"When two sailing vessels are approaching one another, so as to involve risk of collision, one of them shall keep out of the way of the other, as follows, namely: (a) A vessel which is running free shall keep out of the way of a vessel which is close-hauled."

Rule 20:

"Where by any of the rules herein prescribed one of two vessels shall keep out of the way, the other shall keep her course and speed."

The sole question in the case is whether the Ellsworth changed her course, and thus violated the sixteenth and twentieth rules. It is contended on behalf of the appellant that the luffing half a point and

the breaking off half a point, which the captain and helmsman of the Ellsworth admit, were such changes in the course as to bring about the collision, and, finally, that the last maneuver, by putting the helm hard up, itself caused the collision. We concur with the court below in the view that the change in the course into the wind of half a point in a vessel closehauled, and the breaking up of half a point in the opposite direction in order to make the sail full, so as better to control the movement of the vessel, is not a change of course in the vessel closehauled on the wind. The Ellsworth luffed when the Maxwell was showing her red light on the port bow of the Ellsworth. She filled her sails a little more and fell off half a point when she saw the green light of the Maxwell, and concluded, as she had the right to conclude, that the Maxwell was going to the windward of her. The variation one way of half a point, and the neutralizing of that variation by changing half a point in the other direction in a short time, hardly seem sufficient to have caused the collision; and in any event it was not, within the authorities, a change of the course, in violation of the rule. It was held in the case of The Marmion, 1 Asp. 412, that:

"A closehauled vessel is justified in luffing so as to bring her, after she has sighted another vessel, as close to the wind as she can get so as to remain under command; and such luffing is not a deviation from her course that will relieve the other vessel, having the wind free, from the duty of getting out of her way."

In the case of The Aimo, 2 Asp. 96, the privy council held that where a vessel was closehauled, and was approaching another vessel with the wind free, the luffing of not more than half a point, and not enough to lose her headway, was not regarded as a change of course in violation of a similar rule of navigation in force in English waters. In the case of The Earl Wemyss, 6 Asp. 364, the principle above stated was recognized, but it was held that it did not justify a vessel closehauled in luffing as much as 2½ points when approaching a vessel whose duty it was to get out of her way. And this last case accords with the case of The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468. Mars. Mar. Coll. (3d Ed.) p. 475, says:

"A vessel closehauled does not, by luffing a little, and so that she does not lose her headway, break the rule requiring her to keep her course; nor, it is submitted, does she infringe article 22 by breaking off if the wind heads her."

See, also, Spencer, Mar. Coll. 148, 154.
In Mars. Mar. Coll. (3d Ed.) p. 414, it is said further:

"A ship sailing full and by and being kept a good full would be closehauled, within article 14."

We think, therefore, that, if the statements of the captain and others upon the Ellsworth are correct, there was no change of course, within the meaning of the rules, which would subject the Ellsworth to liability for the collision, unless it was by her last maneuver, when her helm was put hard up. It is true that the counsel for the appellant claims that the variation from the course must have been greater than that stated, in order to bring about the collision and the situation as described by those upon the Maxwell. The claim made on

behalf of the Maxwell is that she kept off from the time that the Ellsworth was sighted, and, therefore, that the Ellsworth must have changed her course very considerably in order to show a green light after she was showing a red light. We feel obliged to say that the evidence from the deck of the Maxwell is by no means as satisfactory and as clear as that from the Ellsworth. The precautions which were taken by the captain of the Ellsworth, the showing of the torch, the examination of the light of the Maxwell, and its direction by a night glass, show much watchfulness on the part of the master and others navigating the Ellsworth, while no such care is shown on the part of the captain and the lookout of the Maxwell. If we read between the lines of the evidence, the inference is not strained that the captain and the lookout had their attention diverted by the necessity of pumping, for the Maxwell was leaking some. The captain did not give to the helmsman any particular direction to keep off, until just before the collision, and such change of course as there was before this was made by the helmsman of his own volition and without orders. An admission by the helmsman is satisfactorily proven, and not satisfactorily denied by him, that when he first saw the red light of the Ellsworth on his port bow he may have luffed some, perhaps three-quarters of a point. This luffing, with the tendency of the Ellsworth, sailing light as she was, and on the wind, to drift a point and a half in a mile in the high wind, might explain how the Maxwell opened her green light to the Ellsworth, and thus led the captain of the Ellsworth to order his helmsman to give her a full on, and misled him into thinking that the Maxwell was going to windward. At all events, we are satisfied that the course of the Ellsworth is truly described by those who were on her, and that she did not change it. As it was the duty of the Maxwell to keep out of her way, the collision must, therefore, have been the fault of the Maxwell, unless the final maneuver of the Ellsworth, by which her helm was put hard to starboard and she swung off the wind, was a fault which caused the collision. The court below found that this was in extremis, and we think it was. We credit the statement of the Ellsworth's captain, that the Maxwell was but 100 feet away, and that the collision was inevitable, when he gave the order. It is not at all clear that sufficient time elapsed after the order before collision to make the vessel respond to the movement of the helm. It is not clear, therefore, that the maneuver even contributed to the accident. The emergency was caused by the fault of the Maxwell, which did not keep off enough, or did not go sufficiently to the windward, either of which courses was open to her to keep out of the way of the Ellsworth. The district judge heard the witnesses, and reached this conclusion. It is the duty of this court to accept his conclusion unless it is manifestly against the weight of the evidence. In the case before us, we should have reached the same conclusion on the record. The decree of the district court is affirmed.